# EXHIBIT A

1                    IN THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF CALIFORNIA
2

3      UNITED STATES,
              Plaintiff,
4                                         Sacramento, California
       vs.                                No. 3:21-mj-00007-DMC
5                                         September 10, 2021
       GARY STEPHEN MAYNARD,              2:23 p.m.
6              Defendant.
       _____/
7

8

                           TRANSCRIPT OF PROCEEDINGS
9                         MOTION FOR BAIL REVIEW
            BEFORE THE HONORABLE ALLISON CLAIRE, MAGISTRATE JUDGE
10

11                                ---oOo---

12

       APPEARANCES:
13

         For the Plaintiff:            UNITED STATES ATTORNEY'S
14                                     OFFICE
                                       501 I Street, Suite 10-100
15                                     Sacramento, CA  95814
                                       By:  MICHAEL DWIGHT ANDERSON
16                                     Assistant U.S. Attorney

17

         For the Defendant:            OFFICE OF THE FEDERAL
18                                     DEFENDER
                                       801 I Street, Third Floor
19                                     Sacramento, California  95814
                                       By:  HANNAH LABAREE
20                                     Assistant Federal Defender

21

       *(Appearances continued on following page)*
22

23

24      *Proceedings recorded by electronic sound stenography;*
       *transcript produced by official court reporter*
25

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

1    APPEARANCES (Continued):

2


3    Court Recorder:                 Danielle Weisel
                                      U.S. District Court
4                                     501 I Street
                                      Sacramento, CA  95814
5
     Transcribed by:                 Thresha Spencer, CSR, RPR
6                                     U.S. District Court
                                      501 I Street
7                                     Sacramento, CA  95814

8

9

10                        ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SACRAMENTO, CALIFORNIA, Friday, September 10, 2021, 2:23 p.m.

2                              --o0o--

3    (In open court.)

4              THE CLERK:  Calling case number 21-MJ-007; United

5    States versus Gary Stephen Maynard.  This is on calendar for

6    motion for bail review, your Honor.

7              THE COURT:  Appearances, please.

8              MR. ANDERSON:  Good afternoon, your Honor.  Michael

9    Anderson on behalf of the United States, and the government

10   agrees to proceed via Zoom.

11             THE COURT:  Good afternoon, Mr. Anderson.

12             MS. LABAREE:  Good afternoon, your Honor.  Hannah

13   Labaree for Mr. Maynard.  He is appearing by video

14   teleconference from the Sacramento County Jail.  He does

15   consent to appear by Zoom today.

16      I would ask for a few minutes in a breakout room to review

17   the contents of the Pretrial report.

18             THE COURT:  Okay.  I will give you that, and I would

19   make one comment before you do that so that this can be

20   something you discuss.

21      One of the concerns that I have is the discrepancy between

22   the defense proffer and the Pretrial Services report about the

23   availability of family support for paying rent.  The defendant

24   doesn't seem to have income, and the board and care residential

25   proposal is not free.  So I'm going to ask counsel to address

1    that when we're back.

2        Let's take a five-minute recess and put Ms. Labaree and

3    Mr. Maynard into a breakout room.  Thank you, everyone.

4        (Recess taken, 2:24 to 2:31 p.m.)

5            THE COURT:  All right.  We are back on the record.

6            THE CLERK:  Would you like the matter recalled?

7            THE COURT:  Yes, please.

8            THE CLERK:  Calling 21-MJ-007; United States versus

9    Gary Stephen Maynard.  This is on calendar for motion for bail

10   review, your Honor.

11           THE COURT:  All right.  Hello, Mr. Anderson,

12   Ms. Labaree, and Mr. Maynard.

13       Ms. Labaree, do you want to proceed today or where are you?

14           MS. LABAREE:  We do want to proceed.  I think the

15   specific issue you had raised before I went into the breakout

16   room has been resolved.

17       It became -- it came to my attention just before court, and

18   I believe Officer Walker has reached back out to Mr. Maynard's

19   father to clarify, so perhaps we can get it from him.

20           THE COURT:  Let's just pause for me to specify that I

21   have read the detention memo that was submitted, not for

22   purposes of today, but the first time around -- just to get a

23   sense of the government's concerns -- the defendant's motion

24   for bail review, the original report and the supplemental

25   report.

1      Mr. Walker recommends against release.  And what is

2  proposed by the defense is Mr. Maynard's release to a board and

3  care facility that they have located in South Sacramento where

4  a room is being held for him, and my concern was about whether

5  he actually knew that this was going to work out or not.

6      Mr. Walker, do you have an update for me?

7          PRETRIAL SERVICES:  Yes.  The only update I have is

8  that I did speak with defendant's father, and he did indicate

9  that he would be willing to pay the rent until Mr. Maynard

10  could pay the rent on his own.

11          THE COURT:  Okay.  So the proposal made by the

12  defense is available, and I'll hear from both sides and let you

13  argue.  I want to start just by saying, so you both have some

14  idea of how I'm looking at this.  You know, there's a package

15  that's been proposed that's new information sufficient to

16  reopen, as far as I'm concerned.

17      I share every one of the government's danger concerns, and

18  legally I agree with Ms. Labaree because the offense charged

19  here is not one specified in (f)(1).  Detention is only on the

20  table as an option if there -- if the government can establish

21  a serious risk of flight, something more than the risk of

22  flight that's always present when someone is being charged.

23      So, actually, I'd like Mr. Anderson to start with that, and

24  the things that strike me as being the most significant flight

25  risk factors in this case are the defendant's lack of

1    significant ties to this community and his peripatetic history,

2    which Ms. Labaree has a completely plausible explanation for

3    given the academic job market, I find that entirely

4    unsurprising, but I also understand why it raises arguably more

5    than the typical flight risk concerns.

6        But what makes this a serious flight risk and why aren't

7    concerns based just on those factors merely speculative?  Is

8    there anything in particular here that indicates that this

9    defendant has demonstrated some intent to flee?

10            MR. ANDERSON:  Yes, your Honor, thank you.  So

11   this -- this case raises really particular dangerousness and

12   flight risk concerns, and unusually they're woven together a

13   little bit.  So part of what makes this case and this defendant

14   so dangerous is the type of offense he's committing and also

15   the way that he's committing it.

16            THE COURT:  I really do want -- I'm sorry to

17   interrupt you.

18            MR. ANDERSON:  I will link it.

19            THE COURT:  I need to know why this is a serious

20   flight risk case such as I ask the question, are there

21   conditions sufficient to contain danger?  And the dangerousness

22   of the offense conduct is perfectly obvious to me.

23            MR. ANDERSON:  Yes, absolutely, and I'm trying to

24   answer your question, your Honor.  I'm sorry I'm kind of

25   winding to it.  But the way that he commits this offense

1   through movement around the state, across huge geographic

2   areas, he was very, very mobile.  And mobile in a way that was

3   consistent with someone who is being motivated by things that

4   are different than what's motivating a lot of the people that

5   come before the Court.

6       This isn't an arson for profit; this is an arson for

7   revenge.  This is somebody who's driven by some other type of

8   instinct or force or desire to commit these arsons.  And, as a

9   result, he is driving hours and hours through the day and

10  night, as is reflected in the complaint affidavit, in order to

11  move from one location to the other side of California, another

12  location, in this very, very unstable way that's consistent

13  with somebody who is just not going to be reliable for

14  appearing in a court or even staying within the district, let

15  alone staying where he can be monitored.  And I know I'm

16  touching on the dangerousness issue you don't want to get to

17  yet, but then it leads into that other issue.

18      He just has no -- it's not just an instability in the job

19  market -- which frankly is kind of understandable in that

20  career field at this time -- this is an instability that goes

21  so much deeper into the way that he's functioning and

22  interacting with the world.  There's just nothing that's tying

23  him down to the district, and there's, frankly, nothing that

24  was even tying him to a specific location for more than, you

25  know, a day or two.  Even hour to hour, this is somebody who is

1  on the move, who is being driven to go places, and,

2  unfortunately, ultimately, commit arson in these locations in a

3  very, very, dangerous way.  But he's simply not somebody who

4  can be addressed, as far as I can see from the record, in the

5  way that we would try to address the flight risk concerns with

6  many of the defendants that come before the Court.  This is a

7  very different and much more unusual situation.

8          THE COURT:  Thank you.  I understand that argument,

9  and I think it's a strong one.

10     So, Ms. Labaree, setting aside any implications, I think

11  any of us would just be speculating right now about forces that

12  motivate the alleged offense conduct.

13     But simply given the pattern of movement involved in the

14  offense conduct, I understand your client doesn't have a car

15  anymore.  But, even so, why doesn't that pattern itself

16  demonstrate a serious flight risk in the first instance, and

17  secondarily one that I can't reasonably expect would be

18  contained by releasing him to a board and care facility?

19          MS. LABAREE:  Well, I think the first thing is that

20  simply the movement around this state does not equal flight

21  risk.  In other words, Mr. Maynard -- the question for this

22  Court is twofold.  It's whether a serious risk of flight, in

23  other words, is he going to flee from these charges?  And the

24  other one is, is there a risk of his nonappearance in court?

25     The fact that he was somewhat itinerant in the month and a

1    half leading up to his arrest in this case simply does not

2    equate with a serious risk that he's not going to be able to

3    get it together to be in court in front of federal proceedings.

4        He has absolutely no history of that, and he has a very

5    minor criminal history dating to 20 plus years ago, so to the

6    degree that we know anything about his court appearances, you

7    know, that that's the data we have.

8        Beyond that, I think, you know, this is -- this is not

9    somebody with a lot of financial resources.  I think that's

10   abundantly clear from the amount of work I've had to do to put

11   together a bond package and find suitable housing for him.

12       As this Court noted, the car, which was the source of his

13   mobility, has been seized by the government as evidence in this

14   case; he cannot buy a new one.  Any speculation as to whether

15   he will have access to another vehicle is just speculation.

16       He specifically requested that he be housed in Sacramento

17   so that he would have access to the court and to the Federal

18   Defender's Office.  And we found him a place that is close

19   to -- or fairly close, it looks like sort of a hike -- but to

20   the light rail so he has a direct line to downtown Sacramento.

21       So this bond package is specifically designed to consider

22   how do we route this person in the exact district, and even

23   close to the venue within the district that his charges are out

24   of.

25       But that being said also, clearly there are additional

1  conditions available to this Court to impose that can even more

2  firmly tether him and tether him to potential violations such

3  as curfew, ankle monitoring, even to home detention if this

4  Court is so inclined to do that.

5       And I think I did put in my motion the conversation with

6  the owner of the room and board.  I did make clear what the

7  charges were in this case because I didn't want it to come back

8  around on us that this wasn't an acceptable release location,

9  and she's aware of that.

10          THE COURT:  Mr. Walker, when you wrote the report,

11  you had not heard back from the board and care operator.  Do

12  you have any information about any possible limitations on your

13  ability to do location monitoring at that location should I

14  grant --

15          PRETRIAL SERVICES:  I don't have any information on

16  that because I haven't spoken with her.

17          THE COURT:  Ms. Labaree, have you or your social work

18  team directly discussed the requirements of the location

19  monitoring program, which I know you're familiar with, with the

20  operator?

21          MS. LABAREE:  In my brief conversation with the

22  owner, I did mention that we're awaiting to hear what

23  conditions were going to be imposed, and that location

24  monitoring might be one of them.

25       So again, just like the nature of the charges in this case,

1    that did not deter the offer of an open room.

2              THE COURT:  And my memory is failing me a little bit.

3    Usually are the questions related to the availability of

4    location monitoring dependent on there being a landline?

5    Mr. Walker, can you tell me what the --

6              PRETRIAL SERVICES:  A landline is not required.  We

7    have technology.  Yeah.

8              THE COURT:  All right.

9        I am seriously considering a $25,000 appearance bond to be

10   cosigned by the father with location monitoring and home

11   detention at the board and care facility.

12       I think it is a very close call, and under the statutes

13   very close calls need to be resolved in favor of the defendant.

14   It seems to me that if he is subject to Pretrial Services

15   supervision with a mental health condition, an ankle monitor,

16   and home detention, the restrictions on his ability to flee or

17   to pose any danger to the community with additional conduct

18   would be adequately contained.  We'd also, of course, need a

19   condition barring him from any national or state forest or

20   other public lands, all public lands, BLM, I think most of them

21   are closed right now given the fire situation.

22       Mr. Anderson, I know you object to this.  But what other --

23   if I'm going to do it, what other conditions, because I want to

24   put it all on the table, and then we'll take a five-minute

25   recess so Mr. Walker can draft something in email to all of us.

1    What other conditions would you insist on while reserving your

2    objections to the very concept?

3              MR. ANDERSON:  May I make the objections and attempt

4    to change your mind first, your Honor, and then --

5              THE COURT:  Sure.

6              MR. ANDERSON:  So, your Honor, taking some comfort in

7    the idea of ankle monitoring, and I want to say that in this

8    case that's a condition that is not nearly as helpful as in

9    most cases.  And, in fact, the actual facts in this case show

10   that.

11     We had a monitor on the defendant's car for a period of

12   time, and he disappeared.  And even with the devoting a

13   substantial amount of law enforcement resources to tracking him

14   and the existence of the tracker, he still was able to

15   disappear and still was able to commit additional arsons that

16   placed firefighters at risk.

17             THE COURT:  But did he know -- he didn't know there

18   was a tracker on his car.  This was part of the investigation,

19   correct?

20             MR. ANDERSON:  He didn't, your Honor, but if he were

21   to remove this tracker, as people do when they know that they

22   exist and that happens, he would disappear, and he would

23   disappear long enough potentially to -- I don't want to

24   overstate this, your Honor, because I don't want to look

25   like -- but the danger in this case is so, so substantial.

1   Entire communities have burned this year, we're in the midst of

2   just an exceptionally dangerous fire season.  We have been

3   fortunate that there have been few, if any, deaths this year.

4   But we know from prior years just how dangerous these fires

5   are.

6       The ankle monitor just doesn't do the work in this case --

7   although it is better than nothing, it absolutely does not do

8   the work in this case that it does in other cases where we

9   think, "Okay, well, if somebody starts to flee, they'll cut the

10  ankle monitor, and that will give us time to catch them before

11  they get an international flight or before they cross the

12  border into Mexico."

13      Here that's not the concern.  Here the concern is he cuts

14  the ankle monitor and disappears, and it takes five days or a

15  week or two weeks to find him.  And in the course of that time

16  period there's been, you know, devastation that's been racked

17  on the community as a result of that.  So that's my concern

18  with the ankle monitor.  It just doesn't do what we hope it

19  does.

20      The bond package -- again, a bond is better than no bond.

21  But here a bond package is usually a means of convincing a

22  person not to flee because they don't want to damage the loved

23  ones or others around them.  But we're still, and I realize it

24  is speculation to think about why he's committing these crimes,

25  but it is very likely, given the way that they're being

1    committed and what he's doing, that it's not the subject of a

2    process that we can say, "Well, there's a $25,000 bond, and you

3    don't want to lose that bond or put your family at risk for

4    losing that $25,000; therefore, he's going to stay."

5         It's not the type of thing where you can influence him as

6    easily as you could in one of our fraud cases, or in, you know,

7    even a guy in a drug case, often you can find a package that

8    really works using a bond.  And this just isn't that type of

9    case.

10        So doing my best to try to get -- I've always appreciated,

11   your Honor, you're willing to listen and think through what

12   we're arguing, even if you're headed in a different direction,

13   but I'm really trying to do my best to try to convince you.

14             THE COURT:  And you're being very persuasive.

15   Although, I do think that there's a certain amount of

16   speculation about what is going on with this defendant

17   psychologically, and I have great concerns about that.  I just

18   don't think I have any information, you know, on which to base

19   accepting the things that you are implying or assuring myself

20   that I don't need to worry about them, right?

21        When it comes to the bond, my concern, actually, is that he

22   does not appear to have a close relationship with his father,

23   that's very clear.  So the one family member who has offered to

24   cosign an unsecured bond is not someone who I can count on

25   Mr. Maynard to care about sufficiently, that he would be

1  motivated to make his appearances by desire not to harm the

2  father.

3      Ms. Labaree, I don't mean to put you on the spot with this

4  one, but I know that there are also some siblings.  Is there

5  any reason to think that additional time to reach out to them

6  might come up with additional sureties, maybe even some

7  property, or are you just going to rest on what you've got in

8  terms of family?

9          MS. LABAREE:  Your Honor, I do not believe that

10 additional time would yield more sureties.  We've worked on

11 this case, and I've spoken to his -- I've spoken to his dad

12 multiple times a week since Mr. Maynard was charged.  He's

13 extremely concerned about his son, and, you know, I don't --

14 these are not people who have dinner every Sunday night, and

15 Mr. Maynard is a grown man and doesn't have a super close

16 relationship with his family in the sense of talking often, but

17 he certainly would not run out on his father for $25,000.  He

18 is very aware of his dad's retiree status and is very concerned

19 about his dad.  If I could, if there are other of

20 Mr. Anderson's arguments that you would like --

21         THE COURT:  I'm not sure he was done, so let me make

22 sure that Mr. Anderson is able to make every argument he wanted

23 to make to talk me out of where I might have been headed, and

24 then I'll respond to all of them.

25         MR. ANDERSON:  So the overall argument is just this

1   isn't a case where these types of conditions accomplish what

2   we're hoping to accomplish.  And as far as the concern about

3   are we speculating about his motivations or why he's doing what

4   he's doing, I think it's beyond speculation.

5       And the reason it's beyond speculation is because we have a

6   lot of evidence collected about the conduct that he actually --

7   he did, and it varies so dramatically from other cases where

8   there's another motive.  And I mentioned before a profit

9   motive -- we see that in arson cases in federal court -- and

10  sometimes those individuals are suitable for release.  We can

11  get packages together that make sense for them.

12      Sometimes we see sort of a revenge or a

13  I-don't-like-my-employer type of motive, and you can start to

14  think about how you can create conditions that make it so that

15  that person is less dangerous.

16      Here we're in a situation where the only motive that's

17  really left is that he has a desire to commit these arsons.

18  And he's a smart guy, clearly, very knowledgeable, and he

19  committed them in a particularly dangerous way.

20      I mean, this is an insanely dangerous crime, but he did it

21  in a way that was -- could not have been better plotted in

22  order to trap firefighters between the existing Dixie Fire and

23  the fires that Mr. Maynard was setting.

24      But for the Forest Service working so hard and monitoring

25  him, and the monitor on his vehicle and his phone and them

1    being nearby, those fires very well could have spread, and we

2    could be talking about dead firefighters rather than talking

3    about a fire source stopped.

4            THE COURT:  And when -- I don't disagree with you

5    about the inference that those facts supports about a likely

6    motive for committing the crimes.

7       Where I'm pointing out, I think perhaps a leap too far in

8    terms of inferences, is to say, therefore, this is a defendant

9    who suffers from such a compulsion that he would not be

10   constrained having been criminally charged, having been

11   arrested and jailed, that he would be unable to control himself

12   and comply with conditions of release even when on Pretrial

13   Services supervision, on home detention, and with an ankle

14   monitor, banned from public lands.  That's where I don't know

15   that there is factual support.

16           MR. ANDERSON:  I think that's a good point to raise,

17   and I'm glad the Court is bringing that up.  Because it is hard

18   to know exactly how he would react to these situations, but we

19   do have a few pieces of knowledge.  We know that he's had a lot

20   of instability in his life with jobs and moving around.  We

21   also know that when arrested, he threatened the law enforcement

22   officers that he would kill them.

23           THE DEFENDANT:  (Inaudible.)

24           MR. ANDERSON:  So we know there's some --

25           THE COURT:  See, Mr. Maynard, let your lawyer speak

1  for you.  Mr. Anderson is telling me what he thinks the facts

2  will show.  I take everything both sides tell me with a grain

3  of salt.  Sit tight.  Mr. Anderson will make his argument.

4       Go ahead, Mr. Anderson.

5            MR. ANDERSON:  And this is a proffer based on the

6  facts that were set forth in the Pretrial Services report and

7  also the criminal complaint.

8       And given those -- those facts, those give us a weight on

9  the scale on the side of saying, "This is somebody who is going

10  to have a lot of difficulty under Pretrial supervision."

11       On the other side of the scale, we haven't really seen

12  anything yet, except for a hope that generally somebody would

13  not leave their parents in a situation where they're losing

14  $25,000.

15       So we're almost speculating on the other side against these

16  facts that we have developed in the case to say, "Well, usually

17  people act in a certain way."  It's really not clear that

18  that's going to happen in this case because of everything we've

19  seen so far, the facts we do have saying that he's not going to

20  act the way that we usually expect people to act.

21            THE COURT:  And there's a statutory presumption for

22  release, not detention?

23            MR. ANDERSON:  Yeah.

24            THE COURT:  All right.  Ms. Labaree?

25            MS. LABAREE:  So I want to go back to the ankle

1    monitor issue.  I don't have a super extensive counterargument

2    here because I think a lot of the points can be sort of

3    collapsed into a few.

4        In terms of the ability of ankle monitor to track somebody,

5    we rely on that often in Pretrial Services situations with

6    people who have a track record of failing to appear, with

7    people who have a long criminal history of -- of offenses

8    ranging from those that are violent to those that are

9    theft-based, and, you know, motivated by greed or motivated by

10   poverty.

11       There's all sorts of very strong motivations that might

12   compel somebody to commit a violation of pretrial release,

13   including the desire to flee from a ten-year mandatory minimum,

14   for example, where we do find that ankle monitor is sufficient.

15   Because what it does is it puts a short leash, so to speak, on

16   somebody, such that the very capable Pretrial Services officers

17   will get an immediate notification if their person is on home

18   detention, which as we know is the highest form of this, and we

19   do rely on those mechanisms all the time in this court.

20       I understand the fear that this Court, and certainly the

21   prosecutor, is talking about in terms of what if the

22   worst-case-possible scenario happens here?  That Mr. Maynard is

23   guilty as charged, which is, of course, unproven.  And that

24   his, as the speculation goes, his compulsion is so strong that

25   he's not going to care about the ankle monitor, he's going to

1    be overcome.

2        I just think these things are ultimately speculative, and

3    those worse-case scenarios are what this Court would have to

4    find to be so convincing that it would outweigh the use of

5    ankle monitor and these other tools we have.

6        You know, I will go back to the fact that this man doesn't

7    have a car.  So in terms of some -- just the practical reality

8    of what his mobility will be, it's severely shortened from the

9    original sort of tether that he had.

10        And, you know, I also think that one of the 3142(g) factors

11    is to look at this person's particular characteristics, and one

12    of those is whether he's been on pretrial or whether he was on

13    parole, probation, some type of court release.  And one of the

14    questions you asked there -- and I know because I'm on the

15    other side of the argument often -- is if he's alleged to have

16    committed this instant offense while under supervision, under

17    another court system or this court system, why would we believe

18    that there's anything we can do to be sure that he will comply

19    with the conditions of release.

20        And in this case we just have absolutely no information

21    that he would, aside from the speculation of the fear.

22        So I think that, legally speaking, that the correct result

23    here, and honestly the just result for this particular person

24    who I do have every faith is going to comply, is for release

25    under these strict conditions.

1          THE COURT:  Submitted, Mr. Anderson?

2          MR. ANDERSON:  Your Honor, I'd ask that we, if

3    possible, hear from Pretrial Services about how quickly they

4    could realistically react to somebody cutting an ankle monitor.

5    My experience -- and we have had numerous people flee in this

6    district -- is that it's not happening quite as fast as

7    Ms. Labaree is suggesting.

8          THE COURT:  But someone -- I had an after-hours duty

9    call this week because Pretrial was aware that an ankle monitor

10   had, in fact, been cut.  They figured that out pretty quickly;

11   I signed a warrant.  How long it takes to locate that person?

12      Look, in any -- any case there is a chance that someone is

13   going to skip town.  Sometimes those people are caught right

14   away, sometimes it takes a long time to find them.

15      But that possibility which exists in every case does not

16   drive the detention or release calculus.  And I am very aware

17   that the stakes are high in this case because of the

18   dangerousness of the charged conduct -- the charged offense

19   conduct.

20      Mr. Anderson is quite right to worry that if this were to

21   turn out to be among that very small -- very, very small

22   percentage of cases in which someone released actually does

23   flee, that the consequences could be grave.  But that's also

24   not the question.

25      The question is whether there are proposed conditions that

1   reasonably assure appearance and safety, and I think -- I think

2   that if this defendant is monitored and his ability to travel

3   is slim to none, could he theoretically skip town and go commit

4   more arsons?  Of course he could, but that is not the question.

5   Is that likely to happen?  I think not.

6       So I'm going to grant the motion.  I see Mr. -- I was just

7   about to ask Mr. Walker for some amendments to what he earlier

8   sent me, but he's already gotten me something, which is good.

9   Home detention, that's good, mental health, good.  Barred on

10  public lands.

11      Mr. Walker, did you also send this to both counsel?

12          PRETRIAL SERVICES:  Yes, I did.

13          THE COURT:  Okay, great.  So everyone should have in

14  their email inbox conditions, and I'm doing this over the

15  objection of the government and against the recommendation of

16  Pretrial Services.

17      And before I even go there, Mr. Maynard, I'm going to

18  address you directly.

19      The law requires me to come up, in most cases, with

20  conditions of release that are sufficient to make sure the

21  defendant comes to court and doesn't commit any other crimes

22  while the case is going on.  And only in the rare case when

23  nothing short of jail is sufficient to do that, can I leave

24  someone in custody in a case like yours.

25      I can't make the finding that having you on home detention

1    is so much riskier than jail, that it's not good enough.  But

2    you need to know a few things.

3         I'm going to order you released based upon a bond -- you

4    don't get released until Monday, in any case -- but when you

5    do, it will be on a basis of a bond that you and your father

6    cosigned, which means if you do try to escape responsibility

7    for this case and just disappear, your father is going to end

8    up owing the United States of America $25,000.

9         Also, should you commit any other crimes while on pretrial

10   release, fail to appear for court while on pretrial release, or

11   violate any of the conditions of your supervision, including

12   the home detention, any of them, it is possible that a warrant

13   could go out for your arrest, and you could go back to jail for

14   the pendency of this case.

15        Given all of the factors that Mr. Walker and Mr. Anderson

16   have been emphasizing to me today, I can predict with a fair

17   amount of confidence that any messing up on pretrial

18   supervision is not going to get you a second chance.  Because

19   everyone is very, very, very worried about you and about this

20   case, and I want to make that very clear.

21        So having -- having given you that lecture, I'm going to

22   order your release based on a $25,000 unsecured bond to be

23   cosigned by your father, Gary Maynard.  You are ordered to obey

24   all laws, make all your court appearances, and you will be

25   subject to Pretrial Services supervision under the following

1   special conditions of release.

2       You must report to and comply with all rules and

3   regulations of the Pretrial Services agency.  Your release will

4   be delayed until Monday, the 13th, at 9:00 a.m.  As soon as you

5   are released, you must report directly to Pretrial Services,

6   which is on the fifth floor of the federal courthouse building.

7   You must reside at --

8           PRETRIAL SERVICES:  Your Honor?

9           THE COURT:  Yes, sir.

10          PRETRIAL SERVICES:  We're on the second floor.

11          THE COURT:  I said fifth floor; that's the marshals.

12  He does not need to go to the marshals, he needs to go to

13  Pretrial Services, thank you, on the second floor.

14      You must cooperate with the collection of a DNA sample.

15  Your travel is restricted to the Eastern District of California

16  unless otherwise approved in advance by your Pretrial Services

17  officer.

18      You must surrender your passport to the Clerk of Court and

19  not apply for or obtain any passport or travel documents during

20  the pendency of this case.  If you are unable to locate your

21  passport, you need to file a Declaration of Lost Passport

22  before September 17th.

23      You must not possess, have in your residence, or have

24  access to a firearm, ammunition, destructive device, or

25  dangerous weapon, and must provide written proof of divestment

1   of any such items under your control.

2       You must refrain from the excessive use of alcohol or any

3   use of a narcotic drug or controlled substance without a

4   prescription from a licensed medical practitioner.

5       You must notify your Pretrial Services officer immediately

6   of any prescribed medications.  And you may not use marijuana,

7   even for medical reasons, even if it's prescribed by a doctor,

8   whether or not it's legal in California.

9       You must submit to drug and alcohol testing as directed by

10  your Pretrial Services officer, and pay for those services

11  based on your ability to pay as determined by the Pretrial

12  Services officer.

13      You must report any contact with law enforcement to your

14  Pretrial Services within 24 hours.  You must participate in the

15  following location monitoring program component and abide by

16  all of the -- sorry, I lost where I was.

17      You'll have a location monitoring unit installed in your

18  residence and a radiofrequency transmitter device attached to

19  your person.  You have to comply with all the requirements of

20  the program and all instructions related to the equipment

21  that's given to you by Pretrial Services or the monitoring

22  company.  You will also pay for that based on your ability to

23  pay as determined by Pretrial Services.

24      You will be on home detention until further order of the

25  Court.  That means you must remain inside the board and care

1   facility at all times except for employment, religious

2   services, medical, substance abuse, or mental health treatment.

3   This is with your attorney, court appearances, other

4   court-ordered obligations, or essential activities that are

5   pre-approved by the Pretrial Services officer.  Please note I

6   said pre-approved, and essential activities include things like

7   haircuts, going to the DMV, going to the bank, other things

8   that cannot be done by someone else on your behalf.

9        You must participate in a program of medical or psychiatric

10   treatment, including treatment for drug or alcohol dependency

11   as approved by your Pretrial Services officer, and you must pay

12   all or part of the costs of such counseling services based on

13   your ability to pay as determined by the Pretrial Services

14   officer.

15        And during the pendency of this case, you must not enter

16   any state or federal park, forest, or other public land without

17   prior approval from the Court.

18        I've already advised you of the consequences of violating

19   any of those terms of release.

20        Anything further, Mr. Anderson?

21            MR. ANDERSON:  Your Honor, two things.  First, could

22   we have an additional condition that he not possess any

23   matches, lighters, or other fire-starting device or equipment?

24        And then the second is, could I ask that this be stayed for

25   at least a week so that I can appeal it to the district judge?

1          THE COURT:  I was expecting that.

2          MR. ANDERSON:  Respectfully, of course.

3          THE COURT:  Of course.  I will first add an

4    additional condition that will be number 16, that you shall not

5    have in your possession matches, lighters, or any other

6    fire-starting device or equipment.

7       And I am granting the government's request for a stay for

8    seven days.

9       What this means, Mr. Maynard, is that they are appealing my

10   decision, which they have every right to do.  So even though I

11   told you you would be released at Monday morning at 9:00, that

12   will not happen because they have a week to file an appeal and

13   have a United States district judge review my decision.

14      Should the district judge affirm my ruling, you will then

15   be released on the next business day following that decision,

16   and your obligation to report to Pretrial Services kicks in the

17   day you are released.

18      If the district judge overturns my decision, then you stay

19   in jail.

20      Ms. Labaree, anything else from the defense?

21          MS. LABAREE:  Not at this time, no.

22          THE COURT:  All right.  Thank you all very much, and

23   good luck to all.

24          MR. ANDERSON:  Thank you, your Honor.

25          THE DEFENDANT:  Thank you.

1              THE COURT:  Court is adjourned.

2         (Proceedings adjourned:  3:08 p.m.)

3                       ---o0o---

4      I, court-approved transcriber, certify that the foregoing

5   is a correct transcript from the official electronic recording

6   of the proceedings in the above-entitled matter.

7

8                              /s/ Thresha Spencer
                               THRESHA SPENCER
9                              CSR No. 11788, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25