PHILLIP A. TALBERT
Acting United States Attorney
MICHAEL D. ANDERSON
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GARY STEPHEN MAYNARD,<br><br>Defendant. | CASE NO. 2:21-CR-00224 TLN<br><br>GOVT.'S OPPOSITION TO DEFENDANT'S MOTION TO REOPEN DETENTION<br><br>DATE: December 20, 2021<br>TIME: 2:00 p.m.<br>COURT: Hon. Jeremy D. Peterson |

### I.  INTRODUCTION

Gary Stephen Maynard is charged by indictment with setting four arson-fires in the Lassen National Forest and the Shasta-Trinity National Forest in violation of Title 18, United States Code, Sections 844(f) and 1855. New evidence that was uncovered following his last detention hearing and not previously filed before with the Court demonstrates even more clearly Maynard is an exceptionally dangerous person. He sets fires to harm people he has never met, including attempted fires in other districts. And, chillingly, Maynard attempted to follow a woman and her three children home with a machete. No combination of release conditions can assure his appearance or the safety of the community; he must be detained.

///

///

## II. BACKGROUND

### A. Maynard's Arson Offenses

During July and August of 2021, Maynard traveled across wide swaths of Northern California setting and attempting to set wildfires. Wherever Maynard went, fires followed. Four of Maynard's fires are charged in the indictment. Arson-fires are always potentially dangerous, but Maynard's fires were particularly so. As described in the government's original detention memorandum and attachments as well as the criminal complaint, Maynard traveled to the evacuation area around the Dixie Fire, an enormous fire that was being fought by thousands of firefighting personnel. ECF Nos. 1 and 5. Many of these firefighters and other first responders were inside of what could be compared to a letter "C" fighting fire that was surrounding the firefighters on three sides. Maynard set three of his fires (two of which are charged in the indictment) behind the firefighters at the open end of the "C". ECF No. 5-1 (exhibit showing placement of fires behind fire line). If investigators from the U.S. Forest Service had not been tracking Maynard using multiple technologies and had been waiting nearby in shifts throughout the day and night, those fires would have grown, potentially cutting off first responders from escape.

Maynard's other fires involved similar close calls. Mountain bikers happened upon one of the fires while it was still small. They were quick enough and knowledgeable enough to slow it down with fire breaks until fire personal arrived and put it out. Two other small fires Maynard set in the same general area on the same day were not able to establish themselves. Another fire was discovered by chance as a fire engine crew drove along a nearby road at night and saw the fire glowing in the distance.

After his arrest, Maynard threatened to kill a Sherriff's Deputy, kicking his cell door and screaming, "I'm going to kill you, you fucking pig. I told those fuckers I didn't start any of those fires."

### B. Newly Recovered Evidence

After his arrest, U.S. Forest Service agents worked with the Federal Bureau of Investigation to access and forensically review encrypted and/or locked digital devices seized from Maynard pursuant to a federal search warrant. The FBI has now been able to access several of his devices. As agents have learned, Maynard frequently used his devices to film his activities.

    1. Maynard's arson attacks in another district.

In addition to his fires in the EDCA, Maynard had also attempted to set fires on private land in

the Northern District of California.  On July 18, 2021, just two days before the first fire charged in the indictment, Maynard set up a video recorder on the dash of his car and filmed portions of a drive he took in a relatively rural part of the Northern District of California.  During the drive Maynard encountered a locked gate blocking his path across private property.  He became upset and made threatening statements regarding the landowner, including a threat to kill.  Maynard then began driving in what he narrated as an attempt to identify and get closer to the house of the person with the gate.  As he drove, Maynard said things like, "I'll just burn this to the ground…" and "that's what you win, you win a wildfire right in your house…"

On the video recordings, after making these threatening statements, Maynard stopped near the side of the road.  The audio then has sounds consistent with Maynard rolling down his window.  Then there is the sound of Maynard trying to strike a match several times before it catches fire.  Maynard continued driving after the match lit, stating "…you want some more [derogatory term]?  You want me to set two fucking fires?  I'm going to burn you up.  I'm going to burn your shit to the ground."  Moments later Maynard stopped again in a heavily vegetated area.  Once again, the recording captured the sound of Maynard rolling down his window.  And once again, it captured the sound of Maynard striking a match.  After the match caught fire, Maynard drove off stating, among other things, "Damn!  That's going to burn like a mother fucker!  Haha!  What's up now [derogatory term]?  I'm getting the fuck out of here!"

Agents were able to locate the area where Maynard attempted to set these fires.  It appears that Maynard's attempts were unsuccessful, likely due to weather conditions.

2. Maynard terrorizing a family for his own gratification while describing his assault and threatening to kill.

On July 4, 2021, a mother and three young children were at a gas station in a small town in the Eastern District of California.  While filling their truck, the mother became concerned about a man in the gas station.  He was staring in their direction and swinging a machete—a broad, heavy knife that is often used as a tool or a weapon.[1]  Due to her concern and uneasiness about the man with the machete,

---

[1] A witness to Maynard's earliest charged fires was initially reluctant to speak with law enforcement.  When approached the next day, he apologized stating that he was afraid of Maynard who had been staring at him earlier the prior day while holding a large knife.

they left the gas station and began driving.  The man with the machete followed them.  As they made their way home, he seemed to pursue them, following wherever they went.  Scared and concerned that he was planning to hurt them, the mother turned to avoid leading him home.  She called 911, and she kept driving until she found a police station and pulled into the parking lot.  As she pulled into the police parking lot, the man finally stopped his pursuit.

This man was not identified at the time, but we now know Maynard video recorded this pursuit.  We do not have guess at his intentions, Maynard described them out loud as it was happening and seemed to enjoy the fear he created.  He said he was following them home to take down their address and return later.  He whispered a plan to cause fear and pain:

> Hi kids, I like you.  [Slurping noise].  [Slurping noise].  [Slurping noise]. [Slurping noise].
>
> …
>
> What's wrong kids, what's wrong, what's wrong little girl, you like people to know where you live little girl?  Maybe you should quit pissing people off and they won't fucking follow you to your house.  Maybe they won't follow you to their house, maybe.  [Low menacing laughter].  You ain't going, I'm going to write down your address [racially charged derogatory term] and then I'm gonna come by later.  I'm gonna lick your face off, boy.  Where you goin' boy?

And, when they turned into the police parking lot, screaming, "I will kill your motherfucking mother right in front of you bitch.  I will kill your whole goddamn family motherfuckers.  I will kill every goddamn person in your family [derogatory term].  I will kill every motherfucker in your family [derogatory term]."  This is not nearly the totality of what Maynard said while pursuing this family, but it provides a descriptive picture.[2]

### III.  PROCEDURAL HISTORY

Maynard was arrested on a federal complaint issued on August 8, 2021, that charged one count of setting timber afire in violation of 18 U.S.C. § 1855.  ECF No. 1.  On August 11, 2021, Magistrate Judge Dennis M. Cota ordered Maynard detained as a danger and a flight risk.  ECF No. 8.  Less than a

---

[2] The recordings in this case have been provided to defense counsel pursuant to a protective order designed to protect the identities and home addresses of Maynard's planned victims.  The government will provide a 3 minute 25 second video of this incident, marked as Ex. 1, to the Court.  Lodging this exhibit may be delayed until the date of the hearing due to issues related to this week's loss of power in the federal courthouse.

month later, Maynard filed a motion to reopen bail. ECF No. 18. On September 13, 2021, the parties appeared in front of Magistrate Judge Allison Claire.[3] ECF No. 19. After hearing argument, Judge Claire ordered the defendant released on an unsecured bond and special conditions. ECF No. 19. Judge Claire agreed to stay her release order to permit the government to appeal to the District Court. ECF No. 19. Before the government could file an appeal, Maynard withdrew his motion. ECF Nos. 23-24.

On November 18, 2021, the Grand Jury returned an indictment charging Maynard with four counts of arson to federal property in violation of 18 U.S.C. § 844(f) and one count of setting timber afire in violation of 18 U.S.C. § 1855. ECF No. 27.

On December 13, 2021, Maynard filed the present motion requesting that detention be reopened. ECF No. 35.

### IV.  MAYNARD SHOULD BE DETAINED

#### A.  Standard under the Bail Reform Act

Bail hearings generally proceed by proffer and the rules of evidence do not apply. 18 U.S.C. § 3142(f). The defendant has the right to call witnesses and to cross-examine government witnesses, if the government elects to call any. 18 U.S.C. § 3142(f).

The court must order a defendant detained if the court finds that conditions cannot be imposed that will assure the defendant's appearance, or the safety of the community or another person. 18 U.S.C. § 3142(e). The burden with respect to the flight risk prong is preponderance of the evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990). With respect to danger, the government bears the burden by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1995).

The Bail Reform Act sets out several factors the Court should consider in reaching its decision regarding detention and release: (1) the nature and circumstances of the offense charged, including whether it is a crime of violence or drug offense; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including ties to the community, past conduct, and employment history; and (4) the nature and seriousness of the danger to any person or the community

---

[3] The transcript has been attached to the defendant's motion as Ex. A.

that would be posed by the person's release.  18 U.S.C. § 3142(g).

B.  **The facts of this case support detention**

1.  Nature and Circumstances of the Offense Charged

Arson is a dangerous crime, and it is a crime for which it is particularly difficult to fashion conditions of release. *See, e.g., United States v. Ferranti,* 66 F.3d 540, 544 (reversing district court release order in arson and witness tampering case and citing cases where elaborate conditions of release were insufficient); *United States v. Arvanitis*, 667 F.Supp. 593 (N.D. Il. 1987) (detaining several defendants in an arson and extortion scheme based on the charged offenses).  The penalties are serious and the incentive to flee is high.

Maynard has now been charged with four counts of 18 U.S.C. § 844(f).  Reflecting the seriousness of the crime, this statute carries a mandatory minimum sentence of five years and a maximum of 20 years of imprisonment on each count.  This increases the incentive to flee and reflects the dangerousness of his conduct.

The nature and circumstances of Maynard's arson offense also show that he is particularly dangerous, even among arsonists.  Over weeks, Maynard has set a series of fires in the vicinity of the Lassen National Forest and Shasta Trinity National Forest.  *See* Complaint Affidavit of USFS Special Agent Tyler Bolen ("Complaint Aff. of Bolen"), ECF No. 1.  Maynard traveled long distances through California specifically to this area.  Complaint Aff. of Bolen.  He entered the evacuation zone and began setting fires behind the first responders fighting the Dixie fire.  In addition to the danger of enlarging the Dixie fire and threatening more lives and property, this increased the danger to the first responders.

Words cannot describe this additional threat to firefighters and other emergency personnel as effectively as the map attached as Exhibit 1 to the government's initial detention memorandum.  ECF No. 5-1.  The map shows the boundaries of the Dixie fire where firefighters were laboring to protect the public at significant personal risk.  The map also shows where Maynard set fires on August 5th and 7th behind those fire lines.  Maynard's fires were placed in the perfect position to increase the risk of firefighters being trapped between fires.  But for the dedication and efforts of U.S. Forest Service investigators working around the clock to track Maynard, those fires would not have been discovered in their infancy.  With Maynard's growing fires at their backs, firefighters would have been placed at much

greater risk. This factor strongly supports detention.

### 2. Weight of the Evidence

The second detention factor also favors detention. As described in the criminal complaint affidavit, Maynard was traveling alone through the forest in isolated areas. Agents had installed a tracker on his vehicle. Where Maynard went, fires started. Not just once, but over and over again. In addition, the government now has recordings of Maynard attempting to set fires in the Northern District of California. This constitutes other acts evidence pursuant to Federal Rules of Evidence 404(b) and shows Maynard engaged in an arson spree. As a result, the evidence is strong and Maynard will be convicted if he chooses to go to trial.

### 3. History and Characteristics of the Defendant/Ties to the Community

Maynard's ties to the community are also exceptionally weak. He was living out of his car alone and traveling across large sections of Northern California. As he traveled, Maynard set fires and threatened members of the public with whom he had no previous contact.

In fact, Maynard appears to hold himself apart from most of humanity with a disproportionate and misdirected sense of revenge and desire to terrorize. His text messages paint a bleak apocalyptic picture. In one example, on June 3, 2021, Maynard wrote:

> I need a car asap or I am going to end the whole world once and for all. No car and there will be no peace. If there is no car by Friday I will start some serious trouble for everyone that has stood by and just watch as I have died inside over the past few weeks. Anything I do not have a car by Friday I will start ending people's fucking worthless lives. I hate this world and if I have to go more than one or two days without a car then I will end the whole world from the disease of humanity.

The tone of this text message is so over the top that it could almost lend itself to being interpreted as a twisted or sick sense of humor, except that Maynard got a car and went on an arson spree in following weeks that did threaten people's lives. Throughout his recordings Maynard makes threats to harm others, often using language directed toward people of a particular racial background and toward people of a particular religious denomination. Maynard also talks about shooting people and killing them in various ways.

Moreover, even prior to his arson spree and this documented behavior, Maynard had was an increasingly unstable and threatening presence. Following Maynard's arrest and accompanying national

media attention, law enforcement agents were contacted by people in different parts of the country who had disturbing interactions with Maynard in the past.  One described police being called when Maynard was terminated from a university teaching job in the Eastern half of the United States.  Another had terminated Maynard's coworking-type office space lease in the Pacific Northwest in 2020 after security footage caught Maynard looking through a window while holding a knife and making threatening statements about people who passed by outside.[4]  Maynard's movements show an increasingly unstable and dangerous person, someone who derives enjoyment from other people's fear in a way that most cannot fathom.  As his threatening and dangerous behavior has escalated, his community ties have been increasingly severed while his flight risk and dangerousness has multiplied.

Therefore, this factor also heavily favors detention.

### 4. Nature and Seriousness of the Danger to the Community

Finally, Maynard poses a particular danger to the community.  He is a serial arsonist, during a dangerous time for state and the public from wildfires.  Four of the last five years have seen major wildfires in the state.  This trend of massive fires is likely to continue.  Wildfires can and do kill Californians and destroy their homes.  Entire towns were destroyed this year.  In past years, many have died.  Moreover, the way Maynard sets his fires is particularly dangerous to first responders and, as shown by the recordings of him setting fires, is part of a desire to hurt people.  Maynard's desire to hurt others is not just limited to arson.  As demonstrated by his own recordings, Maynard has also plotted to assault a young girl and threatened to kill her mother in front of her.  He is simply a person who cannot be trusted on supervision.

The nature of Maynard's arson-fires and other activities also make him a particularly poor candidate for pretrial release.  U.S. Forest Service Agents had a tracker on Maynard's vehicle and were waiting in shifts nearby to track Maynard's movements and discover any fires he set.  These were extraordinary and resource intensive precautions that were necessary because of the difficulty of finding someone in the forest without a tracker and the speed with which a fire can grow.

---

[4] For example, "I'm going to stab you in the throat."  And, in another instance, walking back and forth laughing manically and mumbling to himself.  Though in this second example it appears that the object he is holding may not be a knife.

To the extent that Maynard argues that a residential facility or ankle monitoring can protect the public, that argument is simply wrong. Maynard's dangerous conduct has been escalating. If Maynard leaves a facility or cuts an ankle monitor, the likelihood that Pretrial Services or a law enforcement agency can recapture him before he harms someone is slight. Maynard, for whatever psychological or personal reason, is bent on harming others. He is itinerant by nature and dangerous. Even with a phone tracker active, it still took agents tremendous efforts searching the forests to locate Maynard and install a vehicle tracker. This time there will not be the benefit of a phone tracker. This time there will not be a vehicle tracker. Massive resources, focus, work, and incredible luck stopped Maynard before he killed or seriously harmed someone. Next time he will be gone, and it is likely he will be found only because of a tragedy caused in lives of members of the community.

Through his recordings, his sadistically terrorizing acts, and his fires, Maynard has told us who he is now and what he intends to do. We should take him at his word. While Maynard appears deeply disturbed, he poses an additional danger because he is also highly intelligent. He fled when the family in the truck pulled into the police station, he set fires in ways that were difficult to detect, and he denied setting fires when caught. He combines a strong and apparently growing desire to harm others with the intellect to carry out his worst impulses. With no conditions or combination of conditions sufficient to ensure his appearance or the safety of the community, Maynard must be detained.

### V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the defendant be detained as a flight risk and as a danger to the community.

Dated:  December 17, 2021

PHILLIP A. TALBERT
Acting United States Attorney

By:  /s/ MICHAEL D. ANDERSON
MICHAEL D. ANDERSON
Assistant United States Attorney